[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10772

_____

D.C. Docket No. 9:17-cr-80102-RLR-1

UNITED STATES OF AMERICA

Plaintiff-Appellee
Cross Appellant,

versus

MICHAEL C. BROWN,

Defendant-Appellant
Cross Appellee.

_____

No. 18-10972

_____

D.C. Docket No.  9:17-cr-80102-RLR-4

UNITED STATES OF AMERICA

Plaintiff-Appellee
Cross Appellant,

versus

PHILIP N. ANTICO,

Defendant-Appellant
Cross Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(August 14, 2019)

Before WILLIAM PRYOR, NEWSOM, and BRANCH, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

The main issue presented by these consolidated appeals is whether sufficient evidence supports the convictions of Michael Brown for deprivation of rights under color of law, 18 U.S.C. § 242, and of Philip Antico for obstruction of justice, *id.* § 1512(b)(3), for offenses involving an incident of police brutality and a later coverup. Brown was one of several police officers who assaulted the occupants of a vehicle that led the officers on a high-speed chase. After the incident, Brown and the other officers filed reports that omitted most of the details about how they punched and kicked the occupants. Antico supervised many of these officers, and after a video of the incident came to light, he had his subordinates substantially change their reports to better reflect what happened as recorded on the video. When agents of the Federal Bureau of Investigation interviewed Antico about the

incident, he gave misleading answers that concealed that his subordinates' reports had been changed. At separate jury trials, Brown was convicted of deprivation of rights under color of law for his role in the assault, and Antico was convicted of obstruction of justice. At sentencing for both defendants, the district court rejected the government's argument that their Sentencing Guidelines ranges should be calculated using aggravated assault as the underlying offense. The district court sentenced Brown and Antico to downward-variance sentences of three years' probation. Brown's and Antico's primary challenge is to the sufficiency of the evidence, and the government cross-appeals their sentences. Because there is sufficient evidence to support the convictions and no other reversible errors occurred related to either trial, we affirm the convictions. But because it is unclear whether the calculation of each defendant's guideline range rested on a factual finding infected by legal error, we vacate Brown's and Antico's sentences and remand for resentencing.

## I.  BACKGROUND

We divide our background discussion in three parts. First, we describe the facts of the assault and the coverup. Second, we discuss the prosecution of Brown. Third, we discuss the prosecution of Antico.

*A. The Facts.*

In the early morning of August 20, 2014, Officer Justin Harris of the Boynton Beach Police Department tried to perform a traffic stop of a vehicle in which "B.H." was the driver and "J.B." and "A.H." were passengers. B.H. refused to stop as directed but did not otherwise attempt to evade the officer, so Harris continued following him. As B.H. approached an entrance to the highway, his vehicle struck an officer who was on foot. A high-speed chase involving several officers, including Officer Michael Brown, ensued. During the chase, the officers heard over the radio that B.H. had intentionally struck an officer with his car. After B.H. turned onto a residential street, Brown rammed the suspect vehicle and forced it to stop. A group of officers, including Brown, Harris, Ronald Ryan, and several others, approached the vehicle with their guns drawn.

Brown and several other officers then assaulted the vehicle's occupants. Brown was one of the first to reach the vehicle, and he moved toward the front passenger door. Within seconds of reaching the door, he opened it and repeatedly punched and kicked the front-seat passenger, J.B. Officers Harris and Ryan arrived seconds later, and they also repeatedly struck J.B. While J.B. was still in the car with his seatbelt on, Brown attempted to use his Taser against him, twice pulling the trigger and ejecting the Taser's probes. After dragging B.H. and A.H. from the

4

vehicle, other officers repeatedly struck and kicked them. While the assault was occurring, a Palm Beach County Sheriff's Office helicopter flying overhead recorded the incident.

Two of the vehicle's occupants sustained injuries during the assault. B.H. suffered severe lacerations to his head and face and bruising that caused his eyes to swell shut. J.B. also suffered severe bruising and lacerations on the face.

Sergeant Antico, the direct supervisor of Brown, Harris, and Ryan, was not at the scene of the assault. During the chase, he monitored events on the radio, and he stopped to attend to the injured officer. But he saw B.H. at the hospital the night of the incident and was aware of his injuries. And he expected his officers to document the strikes they had used. Antico left for a scheduled vacation from August 20 to August 27, so he did not review the involved officers' reports until he returned.

Hours after the incident but before they learned about the video from the police helicopter, the involved officers—including Brown, Harris, and Ryan— submitted officer reports about the incident. Boynton police officers are trained that an officer report is the primary document for reporting the details about an officer's use of force. An officer report should include a narrative account that recounts the types of force an officer used and the circumstances that justified their

5

use. For example, if an officer struck and kicked a suspect, he would be expected to include those details in his officer report.

Five of the involved officers failed to accurately record their use of force in their officer reports. Brown wrote in his report that he used a Taser against J.B. after J.B. ignored loud verbal commands to exit the vehicle, but he did not describe striking or kicking J.B. Ryan wrote in his report that after Brown used his Taser against J.B. for failing to exit the vehicle, J.B. complied and was handcuffed. Ryan failed to note that he had repeatedly punched J.B. Harris wrote in his report that when he arrived at the vehicle, Brown and Ryan were struggling with J.B., who refused to exit the vehicle or show the officers his hands. Harris stated that he then used his Taser against J.B., which allowed the officers to extract J.B. from the vehicle, but that he had to use his Taser a second time after J.B. continued to resist arrest. Harris did not mention that he had punched J.B. In addition, two other officers failed to fully record their use of punches and kicks against B.H.

The involved officers also filed use-of-force reports. A use-of-force report is an administrative record that the Boynton Beach Police Department uses to compile annual statistics on use-of-force incidents. It is a two-page form on which an officer checks boxes for the general types of force used. The form also instructs that the officer "*must*" include in his offense report "[*a*]*ll* . . . details of the arrest,"

the circumstances that "led [the officer] to believe force was necessary," and the "[t]ypes of force used and [its] effects." Unlike officer reports, which are the official records that the Boynton Police Department may share with the State Attorney's Office or with the public, use-of-force reports are internal to the Boynton Police Department. Boynton officers are trained that checking a box on the use-of-force report is not a substitute for recording the type of force used in the officer report. Five of the involved officers, including Brown, Harris, and Ryan, filed use-of-force reports that checked a box for "[b]lows with hands/fists/feet and other body parts."

After Antico returned to work on August 27, he obtained the helicopter video and watched it with Brown. Antico then began reviewing the officer reports that were submitted and validated as complete. He rejected those reports that did not record strikes or kicks against J.B. and B.H. Antico returned Harris's and Ryan's officer reports, allowing them to change their reports to include that they struck J.B. Ryan's amended report also included several new allegations: that J.B. appeared to be reaching for a weapon before Brown used his Taser; that J.B. refused to surrender his hands for cuffing after he was pulled from the vehicle; and that Ryan had then "delivered 3 to 4 knee strikes to [J.B.]'s right thigh." After viewing the video, Brown changed his report to include that he struck J.B. several

7

times with a closed fist after J.B. refused to comply with loud verbal commands to place his hands on the dashboard, and Brown added that he used a Taser after J.B. still refused to comply. Brown continued to omit that he kicked J.B. Antico also returned reports for two other officers to allow them to add that they struck B.H. An analysis of the electronic metadata of the reports—referred to at trial as the "digital audit trail"—revealed that Antico rejected officer reports eleven times in the 29 hours after watching the helicopter video, including rejecting reports by Harris and Ryan several times each.

After the officers made these changes to their reports, Antico approved and transmitted them to Boynton's chief of police, Jeffrey Katz. After Chief Katz reviewed all the evidence regarding the incident, he referred the matter to state and federal authorities to determine whether the officers violated any laws.

In February 2015, agents from the Federal Bureau of Investigation interviewed Antico. At that time, both Antico and the Bureau agents were unaware that the reporting system for the police department retained a digital audit trail of the changes that the officers made to their officer reports. During the interview, Antico recalled numerous details of the incident, which he referred to as "the most critical incident [he had] been involved in." For example, his recollection of the details of the high-speed chase was extensive, covering over fifty transcript pages,

8

and included details about the original call from the officer who tried to stop the suspect vehicle, which officers were involved in the pursuit, and the direction and streets the suspect vehicle was traveling on. He also admitted that he had watched the helicopter video with Brown and affirmed that he read every one of his subordinates' reports "[w]ord-for-word."

Antico's interview also covered the accuracy of his subordinates' officer reports. In responding to questions about what would raise a "red flag" for him about the reports, Antico repeatedly answered that the failure to record the use of strikes would be a serious red flag, one which would warrant being investigated by Internal Affairs. But he stressed that the officer reports *did* state that the officers had thrown punches and kicks. He failed to mention that the officers' *initial* completed and validated reports did not disclose that conduct. When asked whether he returned any of the reports for corrections, Antico replied, "I'd have to check to see . . . if I rejected anybody's reports," adding, "I might have rejected a couple." Although he had rejected eleven reports that did not record strikes or kicks against J.B. and B.H., Antico told the agents that he had "never really had an issue with . . . these guys not being accurate in their . . . report writing" and "paint[ing] a picture of what happened." And he recalled that the only statement he should have

9

had a subordinate officer change in his report was a "grammatical error" stating that a suspect's face hit the officer's hand instead of vice versa.

## B. The Prosecution of Brown.

A grand jury charged Officers Brown, Harris, and Ryan with deprivation of rights under color of law, 18 U.S.C. § 242, and several counts of falsification of records, *id.* § 1519. In a superseding indictment, the grand jury charged Brown with an additional count for use of a firearm during a crime of violence, *id.* § 924(c)(1)(A)(i). Later, the district court held a joint trial for Brown, Harris, and Ryan.

The video of the incident was the government's most important evidence against the officers. The video depicts Brown first disabling the suspect vehicle by ramming it, then exiting his own vehicle and momentarily pausing with his gun drawn and pointed at B.H., and then moving rapidly toward the front passenger door, immediately opening it, and repeatedly kicking and punching J.B.

Two of the government's witnesses testified about the video. Chief Katz testified that, in his opinion of it, he saw Brown come to the front passenger door, use "some kicks," and then "reach[] into the vehicle and strike[] [J.B.] in the seat." Sergeant Sedrick Aiken, Boynton Beach Police Department's "use-of-force" expert, testified that the video depicts Brown kicking J.B. and punching him while

10

Brown had his pistol in his hand. Aiken added that it did not look like Brown gave J.B. any verbal commands, and he explained that even if Brown did give commands, he did not give J.B. time to comply before he began applying "hard force" of punches and kicks.

Officer Patrick Monteith, one of the other officers on the scene during the assault, testified that when he reached the suspect vehicle, one person had been dragged out of it but that the officers were still swarming around the vehicle. Monteith stood in front of the vehicle with his rifle aimed at J.B., who was still in the front passenger seat. Monteith's rifle was resting on the windshield itself, and he was perhaps "two [or] three feet" away from J.B. Monteith testified that he could see both of J.B.'s hands throughout the time that he was on the scene, and they were "up, they were blocking, [and] there were no closed fists." J.B. was also "jerking in and out of the vehicle . . . violently one way and then the other way, back and forth." But these movements were not of his "own volition," as he "was being moved" by the officers. Monteith also denied that J.B. ever appeared to be reaching for a weapon. Monteith explained that when he heard Brown beginning to activate his Taser, he observed that J.B. was still buckled into his seat, so J.B. could not have complied with any command to leave the vehicle even if he had

11

wanted to do so. Monteith explained that he called out for someone to unbuckle J.B., after which J.B. was removed from the vehicle.

The government also elicited testimony about the standards that the Boynton police employ for the use of force. Sergeant Aiken testified that Boynton police officers are trained that when an officer encounters "passive resistance"—which includes "not complying with verbal commands, . . . tak[ing] flight, run[ning] from [officers], protesting, sit[ting], grab[bing], hold[ing on] to a chair, railing or staircase,"—he only may use "soft control," such as "pressure points," "escort procedures," and "escort[s] . . . with come alongs." A passenger who refuses to get out of a car when verbally told to do so is engaging in passive resistance. But if an officer encounters "active resistance"—such as when a subject is "flailing, kicking arms and legs . . . [or] tak[ing] any fighting stance towards the officer"—the officer may use "hard force" to incapacitate the subject. Hard force includes the use of a "[T]aser, baton, bean bag from a bean bag shotgun, punches, if necessary, a punch with the fist to the soft tissue areas of the body." In using hard force, the officer targets "the soft tissue areas, the quadriceps area, calf muscles, shoulder, tricep, bicep area, [and] muscle mass areas." Aiken also testified that Brown had last been trained on the lawful use of force in March 2014, five months before the incident.

12

Aiken then opined on whether Brown's use of force was reasonable based on the department's criteria for the use of force. He first explained that using a Taser is not justified if a subject simply refuses to get out of a vehicle after being given three verbal orders to exit. Aiken also read aloud the narrative portion of Brown's officer report from after Brown saw the helicopter video. Aiken affirmed that Brown's description of J.B. as refusing to obey verbal commands was passive resistance and would not justify the force that Brown admitted to using—strikes with a closed fist to the body and the use of a Taser. Aiken also repeatedly testified that, based on the department's criteria for the use of force, it was unreasonable for Brown to punch J.B. with the gun in his hand, to kick him, or to use a Taser against him.

Aiken also expressed concerns about the reliability of the officer reports filed by the three defendants. Aiken affirmed that the officers had initially omitted many details about the level of force used and the alleged circumstances that justified the use of force in their reports. Aiken explained that there was no justification for Brown to omit from his report that he had struck a passenger with a firearm in his hand and that he kicked him. And Aiken explained that the officers' amended reports—which included new details, such as allegations that

13

J.B. appeared to be reaching for a weapon and that he would not show the officers his hands—suggested deception.

The defense rested without calling witnesses or introducing any evidence. The jury convicted Brown of deprivation of rights under color of law (count 1) and of the use of a firearm in a crime of violence (count 2), but acquitted him of the two counts for falsifying a police record. The jury acquitted Harris and Ryan on all counts.

Brown moved for a judgment of acquittal notwithstanding the verdict on the grounds of sufficiency of the evidence as to count 1 and the legal sufficiency of count 2. The district court granted the motion as to count 2 but denied it as to count 1. As to count one, the district court determined that the evidence viewed in the light most favorable to the government was sufficient for a reasonable jury to find that Brown's use of hard force, including punches and kicks, was unreasonable when faced with passive resistance. The district court also ruled that a reasonable jury could find that Brown's failure to disclose the extent of his use of force in his officer report and his violation of departmental policy about the use of force established his consciousness of guilt and willfulness.

Brown also moved for a new trial on the ground that the jury's verdict was against "the weight of the evidence." He later supplemented his motion with

14

"newly discovered evidence"—an enhanced helicopter video purportedly showing him reholstering his weapon before striking J.B.—that was not shown to the jury. The district court instructed Brown to file an amended supplement addressing how the elements for a motion for a new trial based on newly discovered evidence were met. *See United States v. Thompson*, 422 F.3d 1285, 1294 (11th Cir. 2005) ("When a defendant discovers new evidence after trial that was unknown to the government at the time of trial, a new trial is warranted only if: (1) the evidence was in fact discovered after trial; (2) the defendant exercised due care to discover the evidence; (3) the evidence was not merely cumulative or impeaching; (4) the evidence was material; and (5) the evidence was of such a nature that a new trial would probably produce a different result." (citation and internal quotation marks omitted)). Brown filed a memorandum acknowledging that the video did not constitute "newly discovered evidence" under Federal Rule of Criminal Procedure 33(b)(1), but he argued that the district court should consider it anyway in deciding whether to grant his motion in "the interests of justice." The government replied that Brown could not rely on the enhanced video in his motion for a new trial because he failed to introduce it at trial and that, in any event, the video did not support his contention that he reholstered his weapon.

15

The district court denied Brown's motion for a new trial. The district court first concluded that it was limited to evaluating record evidence, which did not include the enhanced video. The district court then observed that Brown had been charged with using several means to assault J.B. other than striking him with his gun in his hand and that the weight of the evidence did not "preponderate[] heavily against a finding" that Brown used unreasonable force through one of the other means. And the district court again ruled that sufficient evidence supported the verdict.

Using the 2016 edition of the United States Sentencing Guidelines, the probation officer initially calculated Brown's total offense level as 27 based on "aggravated assault" as the underlying offense. *See* United States Sentencing Guidelines Manual §§ 2A2.2, 2H1.1(a)(1) (Nov. 2016). The Guidelines define aggravated assault as "a felonious assault that involved . . . a dangerous weapon with the intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon." *Id.* § 2A2.2 cmt. n.1. The probation officer determined that Brown's actions amounted to aggravated assault based in part on his use of a Taser against J.B. Based on an offense level of 27 and a criminal-history category of I, the probation officer calculated Brown's guideline range to be 70 to 87 months' imprisonment.

16

Brown objected to using aggravated assault as the underlying offense. He argued that his use of the Taser did not qualify as aggravated assault because he lacked the intent to cause bodily injury to J.B. The district court sustained the objection on the ground that "[t]here is insufficient evidence to find by a preponderance of the evidence that Brown's intent in using the Taser was to cause bodily injury, rather than to gain control over J.B." As a result, the district court recalculated the guideline range and determined that the total offense level was 16, producing a sentencing range of 21 to 27 months of imprisonment. The district court imposed a downward-variance sentence of three years of probation.

## C. The Prosecution of Antico.

A grand jury charged Antico with obstruction of justice related to his interview with the Bureau, 18 U.S.C. § 1512(b)(3), and two counts of falsification of records related to his aiding and abetting of the filing of false police reports by Officers Brown and Harris, *id.* § 1519.

At trial, the government's evidence about the incident itself and the departmental policies on the use of force was essentially the same as at Brown's trial. The government primarily relied on the video of the incident and testimony by Sergeant Aiken to establish that the officers' actions in assaulting the vehicle's occupants violated Boynton's standards for the use of force.

17

Sergeant Aiken and Chief Katz also testified about Boynton's policies for officer reports and use-of-force reports. Their testimony established that an officer must state whatever force he used in both the use-of-force report and the narrative section of the officer report. Sergeant Aiken also affirmed that during the thirteen years he served as training sergeant, he had never heard of an officer not including details about his use of force in his officer report. Katz and Aiken explained that if an officer did omit such details, it would be a cause for formal discipline. Both Katz and Aiken also testified that once a report is "completed" and "validated" by an officer, it is final and is not a draft report. Aiken testified that it would be unusual for a supervisor to review an officer report and send it back multiple times for revisions for a subordinate failing to include important details about his use of force. He stated that, in his experience, he had never seen a report sent back for three or more substantive revisions. And he testified that, if a shift officer like Antico sent back multiple officer reports for several rounds of revisions, he would remember that event.

The government also elicited testimony about the digital audit trail of the officer reports. Douglas Solomon, who was responsible for the Boynton Beach Police Department's information technology systems, testified that the digital audit trial revealed that Antico had rejected eleven reports in the 29 hours after he

18

viewed the police helicopter video, including rejecting reports by Officers Ryan and Harris three times each.

The government also called Stuart Robinson, formerly an agent of the Bureau, to testify about the investigation of the incident and about Antico's interview with the Bureau. Robinson explained that when he and other Bureau agents first saw the video of the incident, they "were stunned by what [they] saw." The agents requested all reports and all other evidence that had been gathered by the Boynton police about the incident. Eventually, the agents began interviewing people involved in the incident, including Antico.

The government played a video of Antico's interview, and Robinson highlighted each of Antico's misleading statements or omissions. Robinson testified that Antico's misleading statements hindered the investigation because they gave the misimpression that the involved officers' word could be trusted and that their reports were credible. Robinson also explained that, outside the digital audit trail, there was no visible way to detect that the reports had been changed.

The defense rested without calling witnesses or introducing any evidence. In his closing argument, Antico stressed that his statements to the Bureau agents reflected his bad memory and not an intent to mislead.

19

After several hours of deliberating, the jury sent the court a note stating, "Your Honor, we as a jury have reached a verdict on two counts. On the third we cannot agree. We sincerely request your insight on this matter." The district court then conferred with counsel, and Antico's counsel proposed that the jury be sent home for the night to continue deliberating in the morning. He added, "[i]f they still indicate they are deadlocked after an hour or so, at that point read an *Allen* charge to them." *See Allen v. United States*, 164 U.S. 492 (1896) (holding that a trial court may encourage a deadlocked jury to continue deliberating provided it does so noncoercively). After the government agreed to this suggestion, the district court asked for confirmation that, if they received another note about the jury deadlocking, the parties desired the district court to read "the modified *Allen* charge," to which defense counsel replied, "Correct." The district court then told the jury to break for the evening and return the following morning to continue deliberating. Before adjourning for the day, the district court recommended that both counsel should review "T-5, the modified *Allen* charge," referring to the instruction from this Circuit's 2016 Pattern Jury Instructions. *See* Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Trial Instruction 5, at 685–86 (2016).

The following morning, the jury sent the district court a second note that read, "Your Honor, we, the jury, are not able to agree on one count. No amount of

20

time, talk, contemplation or discussion of the facts provided shall result in a unanimous decision." In discussing the note with counsel, the district court explained that it could have the jury return a partial verdict for those counts on which the jury agreed, or it could give the modified *Allen* charge. The following colloquy then ensued:

> [Assistant United States Attorney]: Your Honor, we believe at this point the Court should give the modified *Allen* charge in T-5. The Government is not opposed to a partial verdict, but I believe Defense counsel does not agree, so that is not an option.
>
> The Court: So, the Government would bring the jury in, acknowledge the note and read T-5, the modified *Allen* charge, and send them back.
>
> [Assistant United States Attorney]: Yes, your Honor.
>
> The Court: Defense?
>
> [Defense Counsel]: That is my request.

The district court replied, "Okay, then I will bring the jury in and do that," after which it gave the modified *Allen* charge.

After about an hour of deliberation, the jury sent the court a third note stating that the district court's "comments were/are material," and that as a result, it had reached a verdict. The jury found Antico guilty of the obstruction-of justice-count, but not guilty of the two falsification-of-records counts.

21

Antico moved for a judgment of acquittal notwithstanding the verdict on the ground of sufficiency of the evidence. He again argued that the evidence was insufficient for a reasonable jury to find that he knowingly engaged in misleading conduct because his statements or omissions to the agents were best explained by his faulty memory. Antico also moved for a new trial on the ground that the *Allen* charge was "unconstitutionally coercive" because it asked the jury to consider the costs of the trial and possible retrial.

The district court denied both motions. As to the sufficiency of the evidence, the district court concluded that there was sufficient evidence for the jury to conclude that Antico knowingly misled the Bureau by "not disclos[ing] that he had rejected several reports in quick succession because the reports did not accurately reflect the use of force that Sergeant Antico saw in the [police-helicopter] video." The district court also observed that Antico's memory of other details of the incident was "sufficient evidence . . . demonstrat[ing] a knowing intent to mislead the [Bureau]." As to the motion for a new trial, the district court ruled that its *Allen* charge, the language of which came from the Eleventh Circuit Pattern Jury Instructions, was not unduly coercive.

Months later, a juror sent Antico's counsel an email suggesting that jurors had voted for guilt to ensure that someone would be held accountable for the use of

force; that their verdict reflected that certain jurors harbored bias against police officers; and that certain jurors bullied others to reach a verdict, including by making fun of the complaining juror for having a "crush" on Antico. After receiving this email, Antico requested that the district court interview the juror in chambers, with counsel present, to determine whether further investigation was warranted.

The district court denied the motion to interview the juror. It explained that Federal Rule of Evidence 606(b) and our Circuit's precedent establish "very stringent limitations" on its authority to question jurors about their deliberations and to use juror testimony to impeach a verdict. As for the allegation that some jurors voted guilty to hold someone accountable, the district court ruled that "[t]he juror's vague allegations . . . [were] not clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety occurred during the deliberations." And as to the allegation of bias against police officers, the district court explained that this allegation did not satisfy the narrow exception to the no-impeachment rule that applies to racial bias. *See Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017). And for the allegation of bullying, the district court explained that this allegation "describe[d] nothing more than typical features of jury deliberations" and was "insufficient to violate the no impeachment rule."

23

One month later, Antico learned that a second juror had spoken to the spouse of an Assistant United States Attorney who was not involved in the case to discuss the juror's experience. Antico moved the district court to compel the government to disclose what the second juror said to the spouse, arguing that it was akin to *Brady* material, *see Brady v. Maryland*, 373 U.S. 83 (1963), and must be provided to defense counsel to allow him to evaluate the disclosure and determine whether to file a motion.

The district court denied the motion. It determined that Antico's motion to compel "fail[ed] to present any evidence that impropriety ha[d] occurred," but instead "simply state[d] that a juror spoke with the wife of an [Assistant United States Attorney] about his or her experience as a juror."

As in Brown's guideline calculation, the probation officer initially calculated Antico's total offense level based on "aggravated assault" as the underlying offense. *See* U.S.S.G. §§ 2A2.2, 2J1.2, 2X3.1. Based on an offense level of 21 and a criminal-history category of I, the probation officer calculated Antico's guideline range to be 37 to 46 months of imprisonment.

Antico objected that his guideline calculation should use falsification of reports as the underlying offense and not aggravated assault. Relying on its ruling at Brown's sentencing that Brown's use of the Taser did not constitute aggravated

24

assault, the district court sustained the objection. The district court then recalculated the guideline range and determined that the total offense level was 14, producing a sentencing range of 15 to 21 months' imprisonment. The district court imposed a downward-variance sentence of three years of probation.

## II. STANDARDS OF REVIEW

Three standards of review govern these appeals. We review the sufficiency of the evidence *de novo*, "view[ing] the evidence in [the] light most favorable to the jury verdict and draw[ing] all inferences in its favor." *United States v. Reeves*, 742 F.3d 487, 497 (11th Cir. 2014). We also review *de novo* the "legal interpretation of the sentencing guidelines" and the "application of the sentencing guidelines to the facts." *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014). But "[w]e review for clear error the [underlying] factual findings." *Id.* We review for abuse of discretion a decision to give an *Allen* charge, *see United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008); a decision not to hold an evidentiary hearing to investigate alleged juror misconduct after the end of trial, *see United States v. Venske*, 296 F.3d 1284, 1290 (11th Cir. 2002); and a denial of a defendant's motion for a new trial based on the weight of the evidence, *see United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985).

25

## III. DISCUSSION

We divide our discussion in three parts. First, we address the issues related to Brown's trial. Second, we address the issues related to Antico's trial. Third, we discuss the sentencing issues for both defendants. We conclude that sufficient evidence supports both officers' convictions and that no other reversible errors occurred related to either trial. But we also conclude that Brown and Antico must be resentenced because it is unclear whether, in calculating the defendants' guideline ranges, the district court made factual findings infected by legal error.

### A. The Issues Related to Brown's Trial.

Brown raises two issues for our review. First, he challenges whether sufficient evidence supports his conviction. Second, he argues that the district court abused its discretion in denying his motion for a new trial.

### 1. Sufficient Evidence Supports Brown's Conviction.

To convict Brown of deprivation of rights under color of law, 18 U.S.C. § 242, the government had to prove that Brown acted "(1) willfully and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States." *United States v. House*, 684 F.3d 1173, 1198 (11th Cir. 2012) (citation and internal quotation marks omitted). When a police officer is charged with using excessive force in making an arrest, the constitutional right at issue is the right under the Fourth Amendment to be free from unreasonable

26

seizures. *See Graham v. Connor*, 490 U.S. 386, 394 (1989). Whether an officer violated this right depends on "whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Id.* at 397.

Brown argues that insufficient evidence supports his conviction for two reasons. First, he argues that his use of force was reasonable because J.B. resisted with "active force." Second, he contends that there was insufficient evidence of Brown's willfulness. Neither argument has any merit.

a.  Brown's Use of Force Against J.B. Was Objectively Unreasonable.

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (citation and internal quotation marks omitted). In making this determination, a jury must "weigh the quantum of force employed against the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Dukes v. Deaton*, 852 F.3d 1035, 1042 (11th Cir. 2017) (citation and internal quotation marks omitted). It must consider an officer's actions "from the

27

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004), and recognize that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 396–97.

In considering the "severity of the crime at issue," the jury looks to the crime the victim was suspected to have committed when the force was used. *See, e.g.*, *Stephens v. DeGiovanni*, 852 F.3d 1298, 1321–22 (11th Cir. 2017) (judging whether the officer's use of force was excessive in the light of the nonviolent misdemeanors with which the plaintiff-victim was charged); *Oliver v. Fiorino*, 586 F.3d 898, 908 (11th Cir. 2009) (explaining that the repeated use of a Taser was "utterly disproportionate" where the plaintiff-victim "was not accused of or suspected of any crime, let alone a violent one"); *Galvez v. Bruce*, 552 F.3d 1238, 1243 (11th Cir. 2008) (determining that the charges for nonviolent misdemeanors against the victim of an assault by an officer weighed in favor of ruling that the force used against him was excessive). "More force is appropriate for a more serious offense and less force is appropriate for a less serious one." *Salvato v.*

28

*Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (alteration adopted) (citation and internal quotation marks omitted). Nonviolent misdemeanors are "crime[s] of 'minor severity' for which less force is generally appropriate." *Reese v. Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008); *see also Stephens*, 852 F.3d at 1321–22; *Galvez*, 552 F.3d at 1243.

Ample evidence supports the jury's finding that Brown used excessive force against J.B. Brown does not dispute that he repeatedly struck, kicked, and twice used a Taser against J.B. In all versions of his officer report, he acknowledged that the only circumstance justifying his use of force was J.B.'s failure to comply with loud verbal commands—either to exit the vehicle or to place his hands on the dashboard. But a reasonable jury could have found that Brown either did not give any verbal commands to J.B. or that he did not give J.B. the opportunity to comply with his commands before using severe force. J.B. also was charged with resisting arrest without violence. This is not a serious crime for which severe force is warranted. *See Stephens*, 852 F.3d at 1321–22. And no evidence at trial suggested that a reasonable officer in Brown's position would have suspected that J.B.—a mere passenger—was responsible for the more serious crimes related to the high-speed chase or for using the suspect vehicle to hit a police officer. A reasonable juror could also have found that an officer in Brown's position, knowing that J.B.

29

had only been a passenger in the suspect vehicle and observing J.B. sitting passively in his seat with his seatbelt fastened, would not have perceived him as an immediate threat. And the evidence was also sufficient for the jury to find that a reasonable officer in Brown's position would not have assumed that J.B. was "actively resisting arrest or attempting to evade arrest by flight." *Id.* at 1321 (quoting *Graham*, 490 U.S. at 396). Brown began using force against J.B. within seconds of arriving at the suspect vehicle. The government also presented evidence that Brown gave no orders that J.B. could possibly have followed before Brown began using force. **[**In this circumstance, the jury had more than a sufficient basis to find that it was unreasonable for Brown to use punches, kicks, and a Taser against a nonresisting passenger like J.B.

Before moving on, we address one point about the government's position on Brown's use of force. In its brief and at oral argument, the government implied that because the testimony at trial suggested that Boynton's policies on the use of force reflected the constitutional reasonableness standard, the jury could have inferred that Brown's violations of those policies necessarily amounted to a constitutional violation. But the district court correctly instructed the jury that an officer's violation of a police department's policies on the use of force would not by itself establish that his actions amounted to excessive force. We reject the proposition

30

that we can ever substitute a police department's standards on the use of force for the constitutional standard—even when the policies attempt to mirror the constitutional reasonableness standard. Although the jury may consider a department's policies as relevant evidence, district courts should follow the example here of using limiting instructions to prevent the jury from conflating a violation of departmental policy with a violation of the Constitution.

b.  Brown Willfully Used Excessive Force Against J.B.

To establish that a defendant acted "willfully" in committing a deprivation of rights under color of law, the government must prove that the defendant "act[ed] with 'a specific intent to deprive a person of a federal right made definite by decision or other rule of law,' or 'in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite.'" *House*, 684 F.3d at 1199–1200 (quoting *Screws v. United States*, 325 U.S. 91, 103, 105 (1945) (plurality opinion)). A defendant need not have been "thinking in constitutional terms," so long as his "aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution." *Screws*, 325 U.S. at 106 (plurality opinion). And "the defendant's subsequent conduct may be considered if it supports a reasonable inference as to his prior

31

intent." *House*, 684 F.3d at 1200 (alterations adopted) (citation and internal quotation marks omitted).

The evidence here was more than sufficient for a reasonable jury to find that Brown acted in open defiance or reckless disregard of constitutional limitations on the use of force. Brown's training in the use of force supports the jury's finding of willfulness. *See United States v. Rodella*, 804 F.3d 1317, 1337–38 (10th Cir. 2015) (holding that evidence of training a defendant-officer received on pursuit of suspect vehicles was relevant to whether he acted willfully in unlawfully arresting the driver and subjecting him to excessive force). Sergeant Aiken testified that Brown's actions—punching, kicking, and employing a Taser against a passively resisting passenger—clearly violated the department's policies on the use of force, and he testified that Brown had been most recently trained on the use of force five months before the incident. The bare fact that an officer's actions violated his training on the use of force will not always suggest that his actions were willful— after all, officers must frequently make "split-second judgments" in "tense, uncertain, and rapidly evolving" circumstances. *Graham*, 490 U.S. at 397. But where an officer's actions so obviously violate his training on the use of force, a jury may infer that the violation was willful. Here, the jury could have found that, based on his training, it would have been obvious to Brown that he lacked the

32

authority to repeatedly punch and kick a passenger who presented at most passive resistance.

The jury also could have inferred Brown's willfulness from his filing of police reports that sought to cover up his actions. His initial officer report, filed only hours after the incident, omitted that he kicked and punched J.B. before using the Taser. Only after viewing the helicopter video did Brown admit to having struck J.B. several times with a closed fist. And Brown never admitted to having kicked J.B. even in his later reports. Based on Brown's misleading officer reports, the jury reasonably could have inferred that Brown was conscious that his actions were unlawful, but recklessly disregarded that fact in choosing to assault J.B. *Cf. House*, 684 F.3d at 1202 (concluding that an officer's repeated "attempt[s] to conceal his actions by making false statements in his incident reports" supported jury's finding that he acted willfully when he seized motorist in violation of the Fourth Amendment).

Brown responds that the shortcomings of his officer report do not reflect a consciousness of guilt because he checked a box in his use-of-force report stating that he used "blows with hands/fists/feet." But Boynton officers are trained—and indeed, the use-of-force form itself states—that use-of-force reports cannot substitute for recording the extent of the use of force in the officer report. And the

33

evidence at trial established that an officer in Brown's position would understand that failing to record the use of punches or kicks in an officer report would be a violation of departmental policy that could warrant formal discipline. So the jury could have reasonably found that Brown's omissions from his officer report were deliberate and reflected a knowledge that his actions were unlawful.

## 2. The District Court Did Not Abuse Its Discretion in Denying Brown's Motion for a New Trial.

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "When considering a motion for a new trial, the district court may weigh the evidence and consider the credibility of the witnesses." *United States v. Albury*, 782 F.3d 1285, 1295 (11th Cir. 2015) (citation and internal quotation marks omitted). A motion for a new trial based on the weight of the evidence is "not favored" and is reserved for "really exceptional cases." *Martinez*, 763 F.2d at 1313 (citation and internal quotation marks omitted). For a new trial to be warranted, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* Although the standards for granting a motion for acquittal, *see* Fed. R. Crim. P. 29, and a motion for a new trial under Rule 33 are similar, they are not identical. A district court may grant a new trial based on the weight of the evidence even if the

34

evidence is sufficient to convict in the "rare" "case in which the evidence of guilt although legally sufficient is thin and marked by uncertainties and discrepancies." *Butcher v. United States*, 368 F.3d 1290, 1297 n.4 (11th Cir. 2004) (citation and internal quotation marks omitted); *accord Martinez*, 763 F.2d at 1313 ("[C]ourts have granted new trial motions based on weight of the evidence only where the credibility of the government's witnesses had been impeached and the government's case had been marked by uncertainties and discrepancies.").

Brown does not argue that the government's case against him was "marked by uncertainties and discrepancies" or that the credibility of the government's witnesses was impeached at trial. Instead, he stresses that the inconsistency between his conviction and the acquittals of his codefendants warrants a new trial, but this argument is a nonstarter. Brown concedes that inconsistency in a jury's verdict concerning several defendants—convicting some but acquitting others—is not a ground for acquittal under Rule 29. *See United States v. Wright*, 63 F.3d 1067, 1074 (11th Cir. 1995); *see also* 3 Charles A. Wright et al., *Federal Practice and Procedure* § 514 (4th ed. Apr. 2019 update) ("[T]he jury need not act rationally in regard to verdicts of acquittal and conviction on several counts *or concerning several defendants*." (emphasis added)). And we have explained that where a defendant's "arguments regarding . . . inconsistent verdicts [fail] in the

35

context of his motion for judgment of acquittal[,] [i]t follows *a fortiori* that those arguments fail under the abuse of discretion standard we employ" in evaluating a motion for a new trial. *Albury*, 782 F.3d at 1295. Because Brown's argument about inconsistent jury verdicts would fail to justify his acquittal, the district court did not abuse its discretion in rejecting his motion for a new trial on that basis.

Brown also argues that the newly discovered enhanced video of the incident should have been considered when deciding whether "the interests of justice" require a new trial for a verdict against the weight of the evidence, but we disagree. A district court considering whether a verdict is against the weight of the evidence "sits as a 'thirteenth juror,'" *Tibbs v. Florida*, 457 U.S. 31, 42 (1982); *see also United States v. Sinclair*, 438 F.2d 50, 51 n.1 (5th Cir. 1971), and evaluates the evidence presented *at trial*. Evidence that the defendant either knew about during trial but failed to introduce or discovered only after trial falls outside the scope of such motions. When a defendant seeks a new trial based on evidence discovered after trial, a motion under Rule 33(b)(1) provides the only vehicle for considering it, and a defendant must satisfy the requirements of that Rule. *See Thompson*, 422 F.3d at 1294. And when, as here, a defendant expressly concedes that the new evidence does not constitute "newly discovered evidence" within the meaning of Rule 33(b)(1), he may not disguise what is in substance a legally insufficient

36

motion as one challenging whether the verdict is against the weight of the evidence. So the district court correctly disregarded the enhanced video in evaluating Brown's motion for a new trial.

In any case, the video would not have made a difference. Brown argues that the video would reveal that "[t]he sole factor which set [his] actions apart from the [actions] of his acquitted co-defendants"—that Brown allegedly "held a gun in his hand when administering hard force"—never occurred, as the video purportedly establishes that Brown reholstered his weapon. Assuming that Brown is right about the video, there were other obvious factors that set Brown's use of force apart from that of his codefendants. For example, Brown was the only one to kick or use his Taser against J.B. As the district court concluded, Brown's immediate and *total* use of hard force in response to J.B.'s passive resistance justified his conviction regardless of whether he had a gun in his hand when he punched J.B. So even if the district court erred in failing to consider the enhanced video, the error was harmless.

## *B. The Issues Related to Antico's Trial.*

We divide our discussion of the issues related to Antico's trial in three parts. First, we explain that sufficient evidence supports Antico's conviction. Second, we explain that Antico invited any error in giving an *Allen* charge. Third, we explain

that the district court did not abuse its discretion in declining to investigate juror misconduct or to compel the disclosure of the contents of a juror's post-trial conversation, and that the cumulative effect of any errors did not deny Antico a fair trial.

### 1. Sufficient Evidence Supports Antico's Conviction.

To convict Antico of obstruction of justice, 18 U.S.C. § 1512(b)(3), the government had to prove that Antico (1) "knowingly and willfully . . . engage[d] in misleading conduct toward another person, (2) with the intent to hinder, delay or prevent the communication of information to a federal official, (3) about the commission or the possible commission of a federal crime." *United States v. Ronda*, 455 F.3d 1273, 1284 (11th Cir. 2006) (citation and internal quotation marks omitted). "[M]isleading conduct" is defined to include "knowingly making a false statement" and "intentionally omitting information from a statement and thereby causing a portion of such statement to be misleading, or intentionally concealing a material fact, and thereby creating a false impression by such statement." 18 U.S.C. § 1515(a)(3)(A)–(B).

The government identifies three types of false statements or omissions that support Antico's conviction: (1) his repeated statements falsely vouching for the credibility of his officers and stating that he had never had an issue with "these

38

guys not being accurate" in their officer reports; (2) his omission of the fact that several of his subordinates' officer reports that were submitted and validated as complete did not fully or accurately reflect the force they used against J.B. and B.H.; (3) and Antico's omission of the fact that he returned eleven officer reports over a span of 29 hours so that his subordinates could change them to be consistent with the video.

Antico does not deny that his statements or omissions were, in fact, misleading to the Bureau agents, but he argues that they reflect only that he "could not remember or recall exact events." He challenges both whether he knowingly engaged in misleading conduct and whether any misstatement or omissions were made with the intent to hinder the investigation of the police officers' assault.

There was ample evidence for a reasonable juror to find that Antico's statements or omissions reflected an intentional effort to mislead. A reasonable jury could infer Antico's intent from the stark difference in his memory about the incident on the one hand and his inability to recall basic facts about his subordinates' officer reports on the other. The transcript of Antico's account of the incident covers over fifty pages and includes minute details, such as the direction of travel, the streets, and the officers involved in the high-speed chase, as well the precise words said by many of the officers. That Antico's memory was excellent in

recalling the details of the incident but failed him utterly when his interview turned to the accuracy of his subordinates' officer reports about that incident supports an inference that his claims of forgetfulness were false.

A reasonable jury could also have found that an officer in Antico's position would be unlikely to forget the shortcomings in his subordinates' initial officer reports. Multiple witnesses testified that Boynton officers are trained that they must include in their reports all relevant details about their use of force, including whether they punched or kicked a suspect. The testimony also established that the failure to follow this policy could warrant formal discipline, and Antico admitted that if he caught his subordinates omitting details about striking or kicking a suspect, it would be something for Internal Affairs to investigate. Indeed, Sergeant Aiken testified that an officer omitting major details from his report would be a highly unusual event, as he was not aware of any other instance of it happening in the thirteen years he had served as training sergeant. Aiken further testified that it would be unusual for a supervisor to send back an officer report multiple times for revisions for a failure to include important details about the use of force. And Aiken testified that if a shift officer like Antico sent back multiple officer reports for several rounds of revisions, he would remember having done so. Considering that Antico rejected *eleven* officer reports from five officers in the 29 hours after

40

he saw the video based on the failure to adequately document the use of punches and kicks, the jury reasonably could have inferred that this would have been such a memorable event for Antico that it was implausible that he would have forgotten it.

Consider too that the nature of the incident itself would put an officer in Antico's position on alert that his subordinates' officer reports would ultimately become important and would render him unlikely to forget key details about them. Antico referred to the assault as "the most critical incident I've been involved in" and the one that involved the "most force." The brutality of the officers' actions captured on video is, as one witness described it, "stunn[ing]." Chief Katz affirmed that he had "a reaction" to the video, and explained that he "was concerned about the content of the video" and that he "had a great deal of questions" about the officers' actions. The pilot of the police helicopter that filmed the incident, Michael Musto, testified that "[t]he video doesn't look good" because of "[t]he extended time it took to get [the vehicle's occupants] in custody with the kicking and punching," and he explained that this was the first time in his career he had ever forwarded a video to a supervisor to review. A reasonable juror hearing this testimony and seeing the video could have inferred that Antico would have understood the possible ramifications for his department and his subordinates from

41

the incident and from the reports filed about it, and that he would not forget the major details surrounding the reports only six months later.

Antico responds that the jury could not determine that he intended to mislead the Bureau because, during his interview, he repeatedly qualified his statements with caveats like, "I don't remember" or "I'd have to check." But the jury was entitled to find that Antico's use of these qualifying phrases was misleading because he was not communicating everything that he knew.

Antico also highlights three circumstances—that he was not present at the scene of the incident, that he went on vacation for a week afterward, and that he was interviewed six months after the event—to suggest that he simply forgot many of the relevant details. To be sure, a jury could have inferred from these details that Antico's memory was to blame. But we will not vacate a conviction simply because the government did not "disprove every reasonable hypothesis of innocence"; we instead defer to the jury's rational selection between "reasonable constructions of the evidence." *United States v. Mieres-Borges*, 919 F.2d 652, 656 (11th Cir. 1990) (citation and internal quotation marks omitted). Because a reasonable jury could have found that Antico's statements and omissions were knowingly misleading and intended to hinder the Bureau's investigation, we reject Antico's invitation to second-guess the jury.

42

2. Antico Invited any Error in Giving the *Allen* Charge.

Antico next contends that the district court plainly erred by giving a modified *Allen* charge taken directly from our 2016 Pattern Jury Instructions. *See* Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Trial Instruction 5, at 685–86 (2016). He argues that the modified *Allen* charge is unduly coercive because it mentions that another trial will "serve to increase the costs to both sides." He also argues that certain other language from the modified *Allen* charge is "confusing and causes undue pressure on the jury" to reach a unanimous verdict.

The doctrine of invited error bars Antico's challenge to the *Allen* charge. "It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." *United States v. Love*, 449 F.3d 1154, 1157 (11th Cir. 2006) (alteration adopted) (citation and internal quotation marks omitted). It was Antico who first proposed that the district court should give a "modified *Allen* charge" if the jury deadlocked a second time. After the jury deadlocked a second time, Antico again affirmed that he wanted the district court to give "T-5, the modified *Allen* charge," referring to the instruction from our 2016 Pattern Jury Instructions. Because Antico invited the court to give the modified *Allen* charge, he is precluded from challenging it as error now. Although the government has not argued that this was invited error, an appellate court may apply the invited-error doctrine *sua sponte*. *See Harden v. United States*,

43

688 F.2d 1025, 1032 n.7 (5th Cir. Unit B 1982) (explaining that appellate courts may raise waiver *sua sponte*); *see also United States v. Mancera-Perez*, 505 F.3d 1054, 1057 & n.3 (10th Cir. 2007) (explaining that invited error is a kind of waiver that an appellate court may raise *sua sponte*).

Even if Antico did not invite the error, his challenge has no merit. The modified *Allen* charge from our 2016 Pattern Jury Instructions is nearly identical to that from our 2010 Pattern Jury Instructions, with the exception that the 2016 version omits the words "obviously" and "only" from language from the 2010 version stating "[o]bviously, another trial would only increase the cost to both sides." *Compare* Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Trial Instruction 5, at 639–40 (2010), *with* Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Trial Instruction 5, at 685–86 (2016). And we have "repeatedly" held that the 2010 Pattern Jury Instructions' *Allen* charge "is appropriate and not coercive." *United States v. Oscar*, 877 F.3d 1270, 1286 (11th Cir. 2017) (citing *United States v. Bush*, 727 F.3d 1308, 1320 (11th Cir. 2013); *Woodard*, 531 F.3d at 1364). Because the 2016 modified *Allen* charge is substantially similar to the 2010 version, we are bound by our prior precedent to uphold its language as not inherently coercive. *See United States v. Rey*, 811 F.2d 1453, 1460 (11th Cir. 1987) (explaining that we were "bound by precedent" to affirm the use of an *Allen* charge

44

where we had previously "upheld an *Allen* charge that employed very similar language" (italics added)). So we alternatively conclude that the district court committed no error, plain or otherwise, in giving the modified *Allen* charge.

### 3. The District Court Did Not Abuse Its Discretion in Denying Antico's Post-Verdict Motions Regarding Juror Misconduct.

Federal Rule of Evidence 606(b) provides that "[d]uring an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). The Rule adds, "The court may not receive a juror's affidavit or evidence of a juror's statement on these matters." *Id.* This rule reflects the "centuries old" principle—also known as the "no-impeachment rule"—that after a jury has reached its verdict "it will not later be called into question based on the comments or conclusions they expressed during deliberations." *Pena-Rodriguez*, 137 S. Ct. at 861. Rule 606(b) "[a]cknowledg[es] the sanctity of jury deliberations and Lord Mansfield's rule that 'a witness shall not be heard to allege his own turpitude,' [and] it seeks to reach an accommodation between preserving trial by jury and ensuring a just result in each case." 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 606.04 (Mark S. Brodin ed., Matthew Bender 2d ed. 1997).

45

There are four exceptions to the no-impeachment rule. Rule 606(b) provides for three: a juror may testify about (1) whether "extraneous prejudicial information was improperly brought to the jury's attention"; (2) whether "an outside influence was improperly brought to bear on any juror"; and (3) whether "a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2)(A)–(C). The Supreme Court has also held that a fourth exception applies when "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Pena-Rodriguez*, 137 S. Ct. at 869.

Outside these four exceptions, Rule 606(b) prohibits inquiry into a wide range of alleged misconduct. This prohibition includes whether a juror "misunderstood or disregarded evidence, misunderstood or disregarded the judge's instructions, was confused about the legal significance of the jury's answers to special interrogatories or the consequences of the verdict, thought that the jury would be kept out indefinitely until agreement was reached, considered an election of the defendant not to take the stand, believed that recommending mercy would avoid the death penalty, was overcome by weariness or unsound arguments of other jurors, or by a desire to return home." 3 Weinstein & Berger, *Weinstein's Federal Evidence* § 606.04 (footnotes omitted) (collecting decisions). And outside of racial bias, Rule 606(b) prohibits inquiries into alleged improper motives or

46

prejudices of the jury. *See Martinez v. Food City, Inc.*, 658 F.2d 369, 373–74 (5th Cir. Unit A 1981) (explaining that "juror testimony regarding the possible subjective prejudices or improper motives of individual jurors has been held to be within [Rule 606(b)'s prohibition], rather than within the exception for 'extraneous influences,'" as "[t]he proper time to discover such prejudices is when the jury is being selected and p[ere]mptory challenges are available to the attorney" (quoting *United States v. Duzac*, 622 F.2d 911, 913 (5th Cir. 1980)); 3 Weinstein & Berger, *Weinstein's Federal Evidence* § 606.04 (explaining that Rule 606(b) "bars questions about jurors' prejudice").

"No per se rule requires the trial court to investigate the internal workings of the jury whenever a defendant asserts juror misconduct." *United States v. Cuthel*, 903 F.2d 1381, 1382–83 (11th Cir. 1990). For example, where a party alleges that the jury was subject to extrinsic influence, we have held that a district court has a duty to investigate "only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality." *Id.* at 1383 (quoting *United States v. Barshov*, 733 F.2d 842, 851 (11th Cir. 1984)); *accord United States v. Cousins*, 842 F.2d 1245, 1247 (11th Cir. 1988). This standard requires that the defendant "do more than speculate; he must show clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative

47

impropriety has occurred." *Cuthel*, 903 F.2d at 1383 (alteration adopted) (citation and internal quotation marks omitted). Where the evidence presented to the district court fails to establish that an impropriety occurred that falls within any of the exceptions to the no-impeachment rule, the district court is justified in declining to hold a hearing or further inquire into the matter. *See Venske*, 296 F.3d at 1290 (holding that the district court did not abuse its discretion in declining to hold a hearing where all but two allegedly improper statements mentioned in an affidavit concerned the jury's deliberative process or mental impressions, and where the two statements did not establish that the jury was influenced by the extrinsic facts they related).

Antico argues that the district court abused its discretion by failing to interview a juror who alleged a variety of misconduct, but we disagree. The juror first alleged that some jurors were biased because they "used their prior misconceptions about police officers and their feeling of someone needing to be held accountable, where there wasn't one bit of evidence showing [that Antico] was guilty," and that some jurors made their minds up before deliberating. But we have explained that "juror conduct during deliberations, such as . . . statements made during deliberations, including statements calling into question a juror's objectivity," are "internal matters" that are inadmissible under Rule 606(b). *United*

48

*States v. Foster*, 878 F.3d 1297, 1310 (11th Cir. 2018) (alteration omitted) (citation and internal quotation marks omitted); *see also Martinez*, 658 F.2d at 373. Because allegations that some jurors had improper motives or that they failed to meaningfully deliberate do not fall within the limited exceptions to the no-impeachment rule, the district court did not abuse its discretion in declining to investigate them further.

The juror also alleged that the three holdout jurors were bullied into voting guilty, and she specifically complained that some jurors made fun of her and discounted her opinion because she allegedly had a "crush" on Antico. But we agree with the district court that this alleged bullying is "nothing more than [a] typical feature[] of jury deliberations," *Foster*, 878 F.3d at 1310, and that it falls squarely within the no-impeachment rule. And although Antico argues that the "crush" comment suggests gender bias by one juror against the first juror, there are multiple problems with Antico's theory that this allegation required further inquiry: neither this Court nor the Supreme Court has ever suggested that gender bias warrants an exception to the no-impeachment rule; we have never held that bias of one juror *against another juror* constitutes an exceptional circumstance to the no-impeachment rule; and the statement suggesting that the juror had a crush does not present "clear, strong, substantial and incontrovertible evidence" that any

49

juror actually harbored gender bias against Antico. *Cuthel*, 903 F.2d at 1383 (citation and internal quotation marks omitted). So because the evidence presented to the district court failed to allege any impropriety that could possibly fall within an exception to the no-impeachment rule, the district court did not abuse its discretion in declining to hold a hearing or otherwise interview the juror. *See Venske*, 296 F.3d at 1290.

Antico also briefly argues that the statement that "someone had to be held accountable" suggests "that the jury was aware of the publicized external information that two officers previously tried were acquitted so this jury decided to find Antico guilty." Although Antico argues this was "clear evidence" that the jury's verdict was based upon "outside influences," that suggestion is an overstatement. All that the juror's email suggests is that some jurors felt that the incident captured on video warranted accountability for those involved, including for Antico. And Antico's argument does not make much sense because, assuming the jurors *had* heard about the results of the earlier joint trial, they would have known that Michael Brown was convicted of deprivation of rights under color of law, so they would not need to search for "someone" to convict for the offense. In short, Antico has not pointed to "clear, strong, substantial and incontrovertible evidence" that the jury considered extraneous prejudicial information, *Cuthel*, 903

50

F.2d at 1383, so the district court did not abuse its discretion in failing to investigate it further.

Antico also argues that the district court abused its discretion in declining to compel the government to disclose the contents of a conversation that a second juror had with the spouse of an Assistant United States Attorney. Antico argues that the contents of this conversation are akin to *Brady* material and should have been disclosed so that he could determine whether any juror misconduct occurred, but we again disagree.

Antico cites no authority, nor are we aware of any, supporting the notion that we should extend *Brady* to mandate the disclosure of post-verdict evidence that *might* shed light on the nature of the jury's deliberations. Antico cites Rule 606(b), but even under the standard for that rule, the district court would abuse its discretion in failing to further investigate the matter only if Antico pointed to "clear, strong, substantial and incontrovertible evidence" that impropriety falling within one of the exceptions occurred. Considering that Antico presented no evidence other than the facts mentioned above, the district court correctly ruled that Antico "fail[ed] to present any evidence that impropriety has occurred," as his motions "simply state[d] that a juror spoke with the wife of an [Assistant United States Attorney] about his or her experience as a juror."

51

Antico also argues that the cumulative effect of the errors made his trial fundamentally unfair, but no error occurred at his trial. So he cannot establish cumulative error. *See House*, 684 F.3d at 1210 ("[W]here there is no error or only a single error, there can be no cumulative error.").

### C. Brown and Antico Must Be Resentenced Because It Is Unclear Whether, in Calculating Their Guideline Ranges, the District Court Made a Factual Finding Infected by Legal Error.

The government appeals the sentences of Brown and Antico on the ground that the district court erred in declining to use aggravated assault as the underlying offense in calculating their guideline ranges. Section 2H1.1 of the Sentencing Guidelines provides the standard for determining the base offense level for Brown's conviction for deprivation of rights under color of law, 18 U.S.C. § 242:

> (a)    Base Offense Level (Apply the Greatest):
>
>        (1) the offense level from the offense guideline applicable to any underlying offense;
>        . . .
>        (3) **10**, if the offense involved (A) the use or threat of force against a person . . .

U.S.S.G. § 2H1.1(a). The Guidelines also provide that the base offense level for Antico's conviction for obstruction of justice is the greater of 14, *id.* § 2J1.2(a), or, if the offense involved obstructing the investigation or prosecution of a criminal offense, the offense level calculated after applying a cross-reference with respect to the criminal offense, *id.* §§ 2J1.2(c), 2H1.1.

52

The probation officer determined that the underlying offense that produced the highest base offense level for Brown's and Antico's guideline calculations was aggravated assault, which was based on Brown's use of a Taser against J.B. *See id.* §§ 2A2.2, 2H1.1(a)(1), 2J1.2(c)(1), 2X3.1. The Guidelines define aggravated assault as, among other things, "a felonious assault that involved . . . a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon." *Id.* § 2A2.2 cmt. n.1. The Guidelines further define "bodily injury" as "any significant injury; *e.g.*, an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought," *id.* § 1B1.1 cmt. n.1(B), and a "dangerous weapon" as "an instrument capable of inflicting death or serious bodily injury," *id.* § 1B1.1 cmt. n.1(E). Both parties agree that a Taser is a "dangerous weapon," so the remaining questions are whether Brown used a Taser with the "intent to cause bodily injury" and whether the Taser was "involved" in a "felonious assault."

The district court determined that Brown's use of a Taser did not amount to aggravated assault because there was "[s]ome evidence" suggesting that Brown used the Taser "to gain compliance rather than to cause bodily injury." At Brown's sentencing, the district court mentioned and apparently credited Officer Brown's and Officer Ryan's officer reports stating that J.B. had refused loud verbal

53

commands before Brown used his Taser against him and that J.B. had been reaching toward the center console at that time. And the district court explained that it interpreted Officer Monteith's testimony to suggest that he thought that Brown had not used his Taser for the purpose of causing bodily injury. So the district court ruled that "[t]here [was] insufficient evidence to find by a preponderance of the evidence that Brown's intent in using the Taser was to cause bodily injury, rather than to gain control over J.B." **[**At Antico's sentencing, the district court relied on this factual finding in ruling that Antico's underlying offense was not aggravated assault.

As an initial matter, the government contends that the district court's finding of intent is "more akin to a legal interpretation" of the Guidelines than a factual finding and that it "warrants no deference from this Court." But we agree with our sister circuits that we review a finding regarding whether a defendant acted with the intent to cause bodily injury for purposes of section 2A2.2 for clear error. *See United States v. White*, 354 F.3d 841, 844 (8th Cir. 2004) ("We review the district court's factual findings regarding [the defendant's] intended use of [a dangerous weapon for purposes of section 2A2.2] for clear error."); *United States v. Morris*, 131 F.3d 1136, 1138 (5th Cir. 1997) (applying a clear-error standard to a finding that the defendant had an intent to cause bodily injury for purposes of section

54

2A2.2). This review is consistent with our ordinary treatment of a determination of intent as a factual finding. *See, e.g.*, *United States v. Bohannon*, 476 F.3d 1246, 1251 (11th Cir. 2007) (reviewing a finding of intent for clear error); *United States v. Vallejo*, 297 F.3d 1154, 1162 (11th Cir. 2002) (same).

The government argues that the district court erred in determining that Brown lacked an intent to cause bodily injury because a Taser is "designed" to inflict bodily harm, so any intentional use of a Taser against a suspect automatically satisfies the requirement for "intent to cause bodily injury." This argument ignores that it is a question of fact for the district court to determine whether a dangerous weapon is "involved" in a "felonious assault." U.S.S.G. § 2A2.2 cmt. n.1. Here, for example, the district court could have found that Brown's use of punches and kicks was part of a felonious assault but that the assault ended by the time Brown used the Taser, at which time he legitimately used the Taser to gain control over J.B. In that case, the Taser would not have been "involved" in a felonious assault, even if its application was close in time to the assault. So even if the government is correct that an officer's intentional use of a Taser against a suspect automatically entails "the intent to cause bodily injury"— which we do not decide—that fact would not mean that the district court erred in declining to use aggravated assault as the underlying offense.

55

The government also contends that the district court erred in failing to apply an objective test to determine Brown's intent, but this argument is unconvincing. Even if we assume the government is correct that an objective test applies, the district court cited evidence—the accounts of Officers Brown and Ryan—that could support an inference that Brown used the Taser in response to J.B.'s refusal to exit the vehicle and to his having reached toward the center console. As the government admits, the question whether Brown's use of the Taser was lawful turns on whether "that use of force [was] reasonable under the circumstances." So based on the district court's possible view of the evidence judged under an objective standard of what a reasonable officer would do in Brown's place, one could view the district court's ruling as stating simply that there was an insufficient basis to find that Brown's employment of the Taser was unreasonable.

The government next argues that the district court clearly erred in ruling that Brown's intention to bring J.B. under control excluded the possibility that he also intended to cause bodily injury. Brown responds that the government's "dual intent theory"—that Brown could have intended both to cause bodily injury and to gain control of J.B. at the time he used his Taser—is subject to plain-error review because it was not raised below. The government replies that we should review this argument *de novo* because it is a new argument brought in support of a preserved

56

claim of error. We have held that to preserve an objection to a sentencing determination, a party "must raise that point in such clear and simple language that the trial court may not misunderstand it." *United States v. Massey*, 443 F.3d 814, 819 (11th Cir. 2006) (citation and internal quotation marks omitted). But once a party has preserved an issue, it may "make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992); *see also Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1194 (11th Cir. 2018) ("Parties can most assuredly waive or forfeit positions and issues on appeal, but not individual arguments." (alterations adopted) (citation and internal quotation marks omitted)). Because the government preserved the specific ground for review implicated by its dual-intent theory— namely, that Brown had the intent to cause bodily injury at the time he used a Taser—it may offer new arguments to support that position. *See Black v. Wigington*, 811 F.3d 1259, 1268 (11th Cir. 2016) ("Although new claims or issues may not be raised, new *arguments* relating to preserved claims may be reviewed on appeal." (quoting *Pugliese v. Pukka Dev., Inc.*, 550 F.3d 1299, 1304 n.3 (11th Cir. 2008)).

We also agree with the government that the record leaves doubt about whether the factual finding was infected by a legal error. The district court

repeatedly phrased its finding as being that the government failed to establish that "Brown's intent in using the Taser was to cause bodily injury, *rather than* to gain control over J.B." This language reflected Brown's "single-intent" theory that Brown's intent was *either* to cause bodily injury *or* to gain control, but not both. Because a defendant can have more than one intent and an officer can both intend to control a suspect and also intend to cause him injury, it is legal error to conclude that the presence of some evidence of an intent to control necessarily excludes the possibility that the defendant also acted with the intent to injure. Based on this record, we have no way of knowing whether the district court actually applied this erroneous "single-intent" standard in finding that Brown lacked the requisite intent.

If a district court applies an incorrect legal standard in reaching a factual conclusion, the resulting finding is not insulated by the clear-error standard. *See Holton v. City of Thomasville Sch. Dist.*, 490 F.3d 1257, 1261 (11th Cir. 2007) ("The clear-error standard governs unless the district court 'applies an incorrect legal standard which taints or infects its findings of facts.'" (quoting *NAACP, Jacksonville Branch v. Duval Cty. Sch.*, 273 F.3d 960, 965 (11th Cir. 2001)). And vacatur and remand are warranted when "we cannot say" whether an incorrect legal standard "affect[ed] or influence[d] the district court's [factual] conclusion." *United States v. Kendrick*, 22 F.3d 1066, 1069 (11th Cir. 1994). Because we are

58

not sure that the finding that Brown lacked the intent to cause bodily injury is free from legal error, and this finding caused the district court to decline to apply aggravated assault as the underlying offense, we must vacate Brown's sentence and remand for resentencing. Because the district court relied on this same factual finding in ruling that Antico's underlying offense was not aggravated assault, we also vacate Antico's sentence and remand for resentencing.

## IV. CONCLUSION

We **AFFIRM** the convictions of Brown and Antico, **VACATE** their sentences, and **REMAND** for resentencing.

59