Filed 10/11/23  P. v. Schmidt CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C096374 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE006835) |
| v. | |
| BRYAN WAYNE SCHMIDT, | |
| Defendant and Appellant. | |

Defendant Bryan Wayne Schmidt, a former Elk Grove police officer, responded to a report of a robbery at a retail store.  When he arrived, he saw officers already on scene pointing guns at two suspects lying prone on the ground, one of whom was not complying with orders to move his hands away from his waist.  Defendant quickly approached the noncompliant suspect from the side and used the heel of his foot to kick or stomp on the suspect's head.  Defendant then kicked the suspect's arms out from underneath him and, with another officer's assistance, handcuffed him.

1

Defendant subsequently was charged with battery resulting in serious bodily injury (Pen. Code, § 243, subd. (d)—count one) and assault under color of authority. (Pen. Code, § 149—count two.) After a jury trial, defendant was found guilty as charged.

On appeal, defendant argues: (1) the trial court erred and violated his constitutional rights by denying his motion in limine "for an exception" to Code of Civil Procedure section 231.7,[1] which makes certain justifications for exercising a peremptory challenge presumptively invalid; (2) the trial court erred and violated his constitutional rights by denying his challenge for cause to Juror No. 4 or, alternatively, that he received ineffective assistance of counsel; (3) the trial court erred and violated his constitutional rights by denying his peremptory challenge against Juror No. 2; and (4) the trial court erred and violated his constitutional rights by admitting the prosecution's evidence of his department's use-of-force policies and defendant's violation of them or, alternatively, that he received ineffective assistance of counsel.

We find no error in the trial court's denial of defendant's motion seeking an exception to section 231.7, or in the admission of the evidence of police use-of-force policies. We conclude defendant forfeited the claim regarding the trial court's denial of his challenge for cause, and we reject his alternative argument that he received ineffective assistance of counsel. We conclude it is unnecessary to reach the merits of his claim regarding the denial of his peremptory challenge because, even if the trial court erred, defendant has failed to establish any resulting prejudice. Accordingly, we will affirm the judgment.

BACKGROUND FACTS AND PROCEDURE

A.  *Prosecution case-in-chief*

On June 5, 2019, officers from the Elk Grove Police Department responded to a reported robbery at a retail clothing and beauty store. Before they arrived, the officers

---

[1]  Undesignated section references are to the Code of Civil Procedure.

were informed that there were three possible suspects, two of whom were fighting with loss prevention officers, that one of those suspects had removed his shirt during the fight, and that a witness had observed gang signs being thrown. Although dispatch indicated "no weapons," it was reported that one of the suspects had left the store to possibly retrieve something from a vehicle before returning to the fight.

As officers arrived at the scene, two suspects were exiting the store. The officers drew their firearms and ordered the suspects to lie on the ground in a prone position with their arms extended, "like an airplane." At first, one of the suspects—the victim in this case—did not comply. Eventually, the suspect got into a prone position on the ground, but he kept his hands near his waistband and refused to comply with the officer's commands to extend his arms.

At this point, defendant, who was an Elk Grove police officer at the time, arrived at the scene. He pointed his gun and ordered the noncompliant suspect to put his hands out. The suspect looked up and mumbled something but did not comply with the order to show his hands. Defendant quickly approached from the side and used the heel of his foot to kick or stomp the suspect's head down to the asphalt. The kick appeared to stun the suspect or momentarily knock him unconscious. Defendant then kicked the suspect's arms out from underneath him and, with another officer's assistance, handcuffed him.[2]

After the suspect was handcuffed, defendant went inside the store to check on the victims of the robbery, and then came back outside and searched the suspect for weapons. Defendant did not find any weapons.

After the suspect was arrested, defendant spoke to the other officers about the incident. Defendant can be heard on camera saying that he told the suspect to show his

---

[2] Most of the encounter was captured on camera and video footage of the incident was played for the jury.

3

hands, but the suspect was "not listening" and was "kinda, like, smiling–doin' that smirk. So, I, bam and I fuckin' kick his–his head.  And I am telling him, put his hands out."

At one point, defendant asked the other officers to mute their body cameras.  The audio was muted for about 10 seconds.  When the audio resumed, defendant stated, "I know I kicked him in the head[;] I don't think I kicked him in the [unintelligible]." Defendant then turned and said something to the effect of "his hands, . . . he wouldn't fuckin' put 'em out," to which another officer responded, "You're singin' that song and dance to the wrong person."

The officer who transported the suspect to jail observed a cut on the suspect's lip, blood around his mouth, and an abrasion and some swelling in his right cheek area. While being transported to jail, the suspect vomited multiple times.

On July 25, 2019, the suspect went to the hospital with complaints of nausea and worsening headaches.  A doctor examined the suspect and determined that he had subdural hematomas on both sides of his head.  The doctor testified that either a punch to the suspect's face by loss prevention officers or the kick to his head by defendant could have caused the hematomas, although, from the video footage, the kick looked to be more impactful.  To treat the injuries, doctors had to perform a bilateral craniotomy, opening up the suspect's skull to drain the blood and relieve the pressure on his brain.

B.     *The prosecution's use-of-force evidence*

Elk Grove Police Lieutenant Daniel Templeton was involved in an internal investigation of defendant's use of force.  Templeton testified that the Elk Grove Police Department's use-of-force policy provides guidelines as to what constitutes a reasonable use of force.  He testified that officers are trained on the policy and guidelines and are expected to follow them.  At the time of the incident, defendant had attended all required trainings.

Templeton testified that under departmental policy, an officer may use deadly force to protect himself or others from what he or she reasonably perceives as an

4

imminent threat of death or great bodily injury. He explained that officers are trained they do not need to wait to see a gun before using deadly force if the officer reasonably perceives an imminent threat of death or great bodily injury. Officers are trained to watch a suspect's hands and to keep them away from the waistband area because that is where firearms are commonly kept. A suspect's refusal to remove hands from the waistband area is a factor in assessing whether a suspect is an imminent threat. However, departmental policy provides that, if feasible, officers should give some type of warning prior to using deadly force.

Elk Grove Police Lieutenant Michael Press testified as the prosecution's expert on use of force and the Elk Grove Police Department's training, tactics, and procedures relating to use of force. Press testified that the department's use-of-force policy is based on California's Peace Officer Standards and Training guidelines. He testified that under the department's policy, officers can use reasonable force in making an arrest. Press discussed lethal use of force and explained that a kick or stomp to the head could be considered a form of lethal force. Press also discussed nonlethal uses of force, such as pain compliance techniques. Press testified that a kick or stomp to the head is not considered a pain compliance technique because of the high likelihood of serious bodily injury or death. Officers are trained that the head should only be targeted where the resistance level creates a life-or-death situation.

Press reviewed the video footage and 911 calls from defendant's encounter with the suspect. Based on the totality of the circumstances, Press opined that defendant's kick or stomp to the head violated the department's use-of-force policy and guidelines. Press emphasized that defendant applied a potentially lethal amount of force, causing the suspect to lose consciousness, even though the suspect had been mostly compliant, was not attempting to flee, was not exhibiting combative behavior, and was in a disadvantageous position relative to the officers. Press acknowledged that officers have to make split second decisions, and that a prone suspect with his hands tucked underneath

5

his body is a significant concern for officers. But he also testified that it is not reasonable to assume a suspect is armed and poses an imminent threat just because the suspect's hand is near his or her waistband.

C.    *Defense case-in-chief*

Defendant testified in his own defense that he decided to kick the suspect in the head because he believed there was an imminent threat of death or great bodily injury. Defendant considered him a threat because he was a robbery suspect involved in an altercation, gang signs were thrown, the suspect's shirt was removed, and the suspect refused to show his hands and had a "thousand-yard stare." As defendant approached the suspect, he saw that the suspect's left hand was still in his waistband and observed the suspect's right elbow moving, which suggested to defendant that the suspect was going to pull out a gun. Defendant's intent was to distract the suspect and move his hands away from his waistband. Defendant believed that his use of force was consistent with his training and experience as a police officer.

Following the incident, and while still at the scene, defendant reported the use of force to a superior, Sergeant Hancock. Defendant explained that the suspect kept his hands by his side despite orders to move them. Defendant did not mention that the suspect's hands were moving or that he believed him to be armed. But defendant did testify that, off camera, he had made a firearm gesture with his hand to indicate his belief that the suspect was armed when informing Hancock about the use of force. Regarding asking the other officers to mute their body cameras, defendant explained that this was common practice so officers could "vent" after "everything was done."

Officers Coleman and Trudeau, the Elk Grove Police officers who first responded to the scene, also testified for the defense. Officer Coleman testified that the suspect caused him to have safety concerns because he appeared agitated, had removed his shirt, and was being uncooperative. In addition, the suspect kept his hands down to his side, near his waistband, which is "where people carry guns or weapons." Further, the suspect

6

was moving in a manner that suggested he might be trying to reach for a weapon. Officer Trudeau testified that she too was concerned that the suspect was trying to retrieve a weapon from his pocket.

Sean McCann, a professor of administration of justice at Napa Valley College, testified as the defense expert on use of force. He testified that defendant's action, which he characterized as a "push-kick," was an intermediate level of force. He concluded that it "clearly" fell within the range of reasonable conduct by "industry standards." He explained that the most important factor in the instant case was the activity of the suspect's hand and "the potential threat that a trained officer would perceive it to be." He testified that the suspect's refusal to move his hands away from his waistband was a key element that an officer would view as "incredibly, potentially dangerous."

Dr. Geoffrey Desmoulin, a biomedical engineering and incident reconstruction expert, testified that he performed a biomechanical engineering assessment of the causation of the suspect's head injuries. In his opinion, the angular velocity of defendant's kick was not sufficient by itself to produce a subdural hematoma. He opined that the suspect's subdural hematoma could have been caused by the cumulative effect of multiple impacts suffered on that date.

D.    *Trial verdict and sentencing*

Defendant was charged with battery resulting in serious bodily injury (Pen. Code, § 243, subd. (d)—count one) and assault under color of authority. (Pen. Code, § 149—count two.). The jury found defendant guilty as charged.

On count one, the trial court imposed but stayed execution of the middle term of three years, placing defendant on formal probation for a period of two years, with the condition that defendant serve 364 days at the county jail. On count two, the court imposed the middle term of two years, but stayed execution of the sentence under section 654. Defendant timely filed a notice of appeal.

7

DISCUSSION

I

*Section 231.7*

Defendant contends the trial court erroneously denied his in limine motion for an "exception" to section 231.7, thereby violating his state and federal constitutional rights to an impartial jury, fair trial, and due process. We disagree.

A. *Additional background*

Both the state and federal constitutions prohibit the use of peremptory challenges to remove prospective jurors on the basis of group bias, such as race or ethnicity. (*People v. Scott* (2015) 61 Cal.4th 363, 383; *Batson v. Kentucky* (1986) 476 U.S. 79, 89 [90 L.Ed.2d 69, 83]; *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277.) Such conduct violates both the equal protection clause of the federal Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*People v. Parker* (2017) 2 Cal.5th 1184, 1211.)

The standard for reviewing a *Batson*/*Wheeler* motion is well established. The court must follow a three-step process. (*People v. Battle* (2021) 11 Cal.5th 749, 772.) First, the party objecting to the peremptory challenge must make a prima facie case by showing facts sufficient to support an inference of discriminatory purpose. Second, if a prima facie case is made, the burden shifts to the opponent to offer a permissible, nondiscriminatory explanation for the challenge. Third, if a nondiscriminatory explanation is offered, the trial court must determine whether that explanation is credible, or whether the strike was in fact motivated by impermissible discrimination. (*Ibid.*)

In 2020, the Legislature passed Assembly Bill No. 3070 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 318, §§1-3), which enacted section 231.7. The statute codifies the *Batson*/*Wheeler* principle prohibiting unlawful discrimination in the use of peremptory challenges. For criminal juries selected after January 1, 2022, it provides that a party is

8

prohibited from using a peremptory challenge to remove a juror based on "race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." (§ 231.7, subd. (a); *People v. Jaime* (2023) 91 Cal.App.5th 941, 943, fn. 1 (*Jaime*).)

Section 231.7 changed the rules for evaluating claims of discriminatory use of peremptory challenges. (*Jaime, supra*, 91 Cal.App.5th at p. 943.) Before section 231.7, trial courts examined peremptory challenges using the three-step *Batson/Wheeler* framework, which required the party objecting to a peremptory challenge to make a prima facie case of discrimination. (*Jaime*, *supra*, at p. 943.) Under section 231.7, this is no longer required. (*Jaime,* at p. 943.) Instead, "upon objection," the party exercising the peremptory challenge must state the reasons for exercising the challenge. (*Ibid*.; § 231.7, subds. (b), (c).) The court shall then evaluate the reasons given "in light of the totality of the circumstances." (§ 231.7, subd. (d)(1).) If the court determines "there is a substantial likelihood that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, as a factor in the use of the peremptory challenge," the objection shall be sustained. (*Ibid*.)

Additionally, the statute makes certain justifications for exercising a peremptory challenge presumptively invalid unless the party exercising the challenge can show "by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race [or other prohibited characteristic], and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case."[3] (§ 231.7, subds. (e), (f).) Those presumptively invalid reasons for

---

[3] Certain other justifications, relating to a juror's behavior, are presumptively invalid unless the court can independently confirm the alleged behavior occurred and counsel can explain why that behavior is significant to the case being tried. (§ 231.7, subd. (g).)

excusing a prospective juror include a negative experience with law enforcement, a close relationship with someone who has been convicted of a crime, and a belief that criminal laws have been enforced in a discriminatory manner.[4] (§ 231.7, subd. (e)(1)-(3).)

Here, defendant moved in limine to be excepted from the presumptions of invalidity listed in section 231.7. Defendant argued that he intended to "voir dire the jury panel specifically regarding their biases against law enforcement and the criminal justice system in order to prevent such explicit and implicit bias against [appellant] and protect his right to a fair trial." He also argued that the statutory presumptions were intended to impose limits on peremptory challenges by the *prosecution* and that applying the presumptions to him would violate his constitutional rights to due process, a fair trial, and an impartial jury. The prosecution opposed the motion, arguing that the statute applies to all parties and that it would be "improper and most likely illegal for the court to exempt the defense from the presumptive prohibitions . . . ." The trial court denied the motion.

B.    *Analysis*

The question we must answer is whether application of section 231.7 to this case violated defendant's rights to an impartial jury, fair trial, or due process. Because this is primarily a legal issue, we apply a de novo standard of review. (*People v. Cromer* (2001) 24 Cal.4th 889, 894.) We find no constitutional violation.

Defendant's argument fails because it rests on two flawed premises: (1) that section 231.7 precluded him from exercising peremptory challenges against biased jurors,

---

[4]    Many of these justifications were accepted as constitutionally permissible under the *Batson*/*Wheeler* standard. (See, e.g., *People v. Avila* (2006) 38 Cal.4th 491, 554-555 (*Avila*) [sibling's involvement in the criminal justice system was a race-neutral explanation]; *People v. Winbush* (2017) 2 Cal.5th 402, 436, 439, 442 [skepticism about fairness of the criminal justice system, views that the criminal justice system is biased, and negative experiences with law enforcement recognized as valid grounds for exclusion]; *People v. Booker* (2011) 51 Cal.4th 141, 167, fn. 13 [negative experience with the justice system is valid, neutral reason]; *People v. Lomax* (2010) 49 Cal.4th 530, 573 [arrest of a juror or close relative is an accepted race-neutral reason].)

and (2) as a result, he was forced to accept a biased jury. Nothing in the statute *precluded* defendant from exercising peremptory challenges against the jurors. Even if the reasons for exercising a particular challenge would have involved a presumptively invalid justification under section 231.7, subdivision (e), that presumption is rebuttable. Defendant could have overcome the presumption by showing "by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case . . . ." (§ 231.7, subds. (e), (f).) Thus, section 231.7 did not preclude defendant from exercising peremptory challenges.

Further, to prove the statute violated his constitutional rights, defendant must show that application of section 231.7 forced him to accept an incompetent juror. Defendant has made no such showing. Nor can he since if a prospective juror is biased, the defendant still may excuse the juror for cause. (§ 225, subd. (b)(1).) Accordingly, we reject defendant's claim that the trial court's denial of his section 231.7 motion infringed his constitutional rights to an impartial jury, fair trial, or due process.

II

*Challenge For Cause of Juror No. 4*

Defendant next contends that the trial court erred and violated his constitutional rights to an impartial jury, fair trial, and due process by denying his challenge for cause to Juror No. 4. We conclude defendant forfeited this contention because he failed to exercise a peremptory challenge to remove Juror No. 4, failed to exhaust all of his peremptory challenges, and failed to express his dissatisfaction with the jury as selected. We also reject defendant's alternative argument that the failure to exercise a peremptory challenge against Juror No. 4 constituted ineffective assistance of counsel.

11

A.     *Additional background*

During the initial phase of voir dire, Juror No. 4 expressed some concerns about serving on this case given the "particularly controversial subject," and stated that he generally was "less sympathic [*sic*] towards law enforcement in that situation."  The judge then asked a series of questions to ascertain whether Juror No. 4 could be fair and impartial notwithstanding his concerns.  Juror No. 4 repeatedly assured the judge that he was capable of fairly and impartially assessing the facts and evidence in the case.

The following day, in response to questioning by the defense, Juror No. 4 indicated that his feelings about law enforcement had been affected by media coverage of incidents involving police officers' use of force and by the history of policing in the United States.  Juror No. 4 also stated he had attended recent protests against police violence and brutality and had made charitable contributions to organizations engaged in social justice work.  Juror No. 4 did not believe law enforcement officers more likely than not abuse their authority.  But Juror No. 4 had one prior negative experience with law enforcement involving a traffic stop that he felt "was not motivated in good faith."

When Juror No. 4 was asked by defense counsel if he still believed he could be fair and impartial in this case, the juror responded:  "I certainly will struggle with it.  It's a hard question to answer.  [But] if you're looking for a yes or no, the answer is yes . . . ."  Similarly, when asked by the prosecution whether he would have any problem finding defendant not guilty if the prosecution failed to prove its case, the juror said he "would struggle with that," but would be able to find defendant not guilty.

Later, outside the presence of the other prospective jurors, the judge asked Juror No. 4 whether he could perform his duties fairly and dispassionately, unaffected by his "very strong beliefs and passions for social justice issues?"  The juror answered, "I've been considering the last two days of this conversation.  I don't think I can do it.  I don't think I would be the right person to do it."  He explained, "[A]fter examining my own deep, you know, beliefs on certain specific issues, I think that I'm not—it's really hard to

12

say. I just think that this case, in particular, is difficult for me from . . . a moral standpoint. To answer your question, I do think that I'm perfectly capable of evaluating facts and being objective. I just simply think, in this case . . . that would be more difficult for me and I'm not sure that I can do it." The following colloquy then occurred:

"THE COURT: Can you tell me you will do it?

"[JUROR NO. 4]: Yes.

"THE COURT: What I mean by that is, can you definitively participate as a juror in this case, restricting yourself and your process to a complete and full examination of the facts and the application only of the law to those facts, to determine the issue of the defendant's guilt or innocence, keeping out of the equation any personal views or animus towards law enforcement?

"[JUROR NO. 4]: Yes.

"THE COURT: Okay.

"[JUROR NO. 4]: It will be incredibly hard, I think, the more that I consider the duration, right, but, yes, the answer to your question, Your Honor, is yes."

Defense counsel subsequently moved to excuse Juror No. 4 for cause. The prosecution opposed, and the trial court denied the challenge. The court reasoned that although Juror No. 4 said he would "struggle," he also said that he would, in the end, comply with his obligation to fairly and impartially evaluate the case.

Defendant did not use a peremptory challenge on Juror No. 4. Defendant also did not use all of his peremptory challenges or object to the jury as constituted. Juror No. 4 was seated as a juror.

B.     *Analysis*

Defendant contends the trial court erred in denying his challenge for cause to Juror No. 4. The People counter that this contention has been forfeited on appeal. We agree with the People.

13

To preserve a claim of error in the improper denial of a challenge for cause, the defendant must (1) use a peremptory challenge to remove the juror in question; (2) exhaust all his peremptory challenges (or justify the failure to do so); and (3) express dissatisfaction with the jury ultimately selected. (*People v. Winbush, supra*, 2 Cal.5th at p. 425.) Defendant failed to satisfy any of these requirements. Therefore, he forfeited his claim of error with respect to the denial of his challenge for cause.[5] (*Id*. at pp. 424-426.)

Anticipating forfeiture, defendant argues in the alternative that his counsel was ineffective for failing to use a peremptory challenge to remove Juror No. 4. We are unpersuaded.

To prevail on a claim of ineffective assistance of counsel, defendant must prove (1) trial counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) If the defendant fails to make a sufficient showing on either component, the claim must fail. (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1158.)

Here, defendant has not established prejudice. Defendant claims that he was prejudiced because Juror No. 4 was biased. From this, he reasons that it is reasonably probable replacing Juror No. 4 "with an impartial juror would have resulted in a verdict more favorable" to defendant. However, the record does not establish that any juror who served on the jury, including Juror No. 4, was biased.

Although Juror No. 4 indicated serving as a juror on the case would be "difficult," and the juror at times expressed concerns or doubts about his ability to keep his personal

---

[5]     Even if the issue were not forfeited, we would deny it on the merits. As discussed *infra*, the juror's statements were, at most, conflicting, and the trial court reasonably could have concluded the juror would perform his duties fairly and impartially.

views towards law enforcement separate, the juror also repeatedly assured the trial court that he could fairly and impartially decide the case based upon the evidence presented. In the end, the court directly asked the juror whether he could determine the issue of the defendant's guilt or innocence unaffected by any personal views or animus towards law enforcement, and the juror answered, "Yes." Thus, the record reflects the juror's willingness and ability to put aside his personal views and render an impartial verdict based on the evidence and instructions. (See *People v. Davis* (1972) 27 Cal.App.3d 115, 120 [an abstract bias will not of itself disqualify a juror if it appears the juror can set it aside and fairly and impartially decide the case]; *People v. Kipp* (1998) 18 Cal.4th 349, 366 [trial court reasonably could determine juror would impartially perform duties despite expressed prejudice against defendant's appearance]; *People v. Bivert* (2011) 52 Cal.4th 96, 115 [record supported finding that juror's strong pro-death penalty views would not substantially impair performance of his duties].)

To the extent the juror's responses were conflicting or equivocal, we are bound to defer to the trial court's determination that the juror would be able to perform his duties fairly and impartially. (*People v. Mickel* (2016) 2 Cal.5th 181, 217; *Avila, supra*, 38 Cal.4th at pp. 530, 539; *People v. Hillhouse* (2002) 27 Cal.4th 469, 488; *People v. Kaurish* (1990) 52 Cal.3d 648, 675; see *Alcazar v. Los Angeles Unified School Dist.* (2018) 29 Cal.App.5th 86, 100 [no abuse of discretion in declining to strike juror who made conflicting statements about ability to keep an open mind].) We afford this deference out of recognition that the trial judge who observes and speaks with a prospective juror is in the best position to evaluate the juror's state of mind. (*Avila, supra*, at p. 529.) Nothing in this record convinces us that Juror No. 4 was biased or that it is reasonably probable a successful challenge against Juror No. 4 would have resulted in a verdict more favorable to defendant. Accordingly, we find defendant's ineffective assistance claim lacking in merit.

## III

### *Peremptory Challenge of Juror No. 2*

Defendant contends the trial court erred and violated his constitutional rights to an impartial jury, fair trial, and due process when it erroneously denied his peremptory challenge of Juror No. 2. We again disagree.

A.   *Additional background*

Juror No. 2 worked as a maintenance supervisor. He previously served as a juror on an assault and battery case, and previously was convicted in Arizona of possession of marijuana. He said he knew "a lot" of people who had been arrested and that a family member was imprisoned after being involved in an incident like this case. The juror did not express any negative views toward law enforcement, and he consistently and unequivocally maintained he could be fair and impartial.

The defense sought to exercise a peremptory challenge against Juror No. 2. The prosecutor objected on grounds the strike was presumptively invalid under section 231.7. The prosecutor reasoned: "[Juror No. 2] appears to be of some kind of ethnicity other than Caucasian. Our victim is the same, in terms of something other than Caucasian. [Juror No. 2] is also part of the community that has suffered law enforcement involvement . . . . He indicated he could be fair, holds nothing against law enforcement. But I think, based on his ethnic background and his background with respect to having suffered some convictions, I think he does fall within a cognizable group."

Defense counsel responded that he did not understand the objection because Juror No. 2 had not expressed any of the presumptively invalid grounds under section 231.7. Counsel further explained that his decision to excuse the juror was not based on the juror's ethnicity, it was "more based upon trying to get to other jurors" who he believed would be better suited to serve in the case.

16

Applying the presumption of invalidity under section 231.7, the trial court sustained the prosecution's objection and denied the peremptory challenge. Juror No. 2 was seated as a juror.

B.     *Analysis*

Defendant contends the trial court prejudicially erred and violated his constitutional rights in denying his peremptory challenge to Juror No. 2. We conclude it is unnecessary to reach the merits of the claim because, even if the trial court erred, defendant has failed to establish any resulting prejudice.

As a preliminary matter, we note that while the erroneous *denial* of a section 231.7 objection is per se reversible (§ 231.7, subd. (j)), the statute is silent on the proper remedy when a section 231.7 objection is improperly sustained. Defendant argues that because of the "critical role" peremptory challenges have in ensuring a defendant's right to an impartial jury, the improper denial of a peremptory challenge should be viewed as a structural error requiring automatic reversal. Case law compels the opposite conclusion.

Although " '[p]eremptory challenges are intended to promote a fair and impartial jury, . . . they are not a right of direct constitutional magnitude.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 673.) Thus, improper denial of a peremptory challenge is not structural error and warrants reversal only if the accused can show the error affected his or her right to a fair and impartial jury. (*People v. Webster* (1991) 54 Cal.3d 411, 438-439; accord, *People v. Singh* (2015) 234 Cal.App.4th 1319, 1331-1332.) This is the same standard that applies when a court erroneously denies a challenge for cause. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1048; *People v. Black* (2014) 58 Cal.4th 912, 916-918, 920-921.) Here, defendant has made no attempt to show that Juror No. 2 was biased or otherwise incompetent. Indeed, defendant has not articulated any concerns regarding the juror's ability to be fair or impartial. Accordingly, we find any error in denying defendant's peremptory challenge of Juror No. 2 harmless.

17

IV

*Evidence of the Elk Grove Police Department's Use-of-Force Policies*

Defendant contends the trial court erred when it admitted evidence of the Elk Grove Police Department's use-of-force policy and guidelines, and defendant's violation of them.[6]  We find no error.

A.  *Additional background*

The rules governing the admission of expert opinion testimony are well settled. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299.)  " '[The] decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that [persons] of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' "  (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 844; Evid. Code, § 801, subd. (a).)  " 'If the matter in issue is one within the knowledge of experts *only* and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert opinion evidence in order to establish a prima facie case.' [Citation.]"  (*Allgoewer v. City of Tracy* (2012) 207 Cal.App.4th 755, 761-762 (*Allgoewer*).)  On the other hand, when the subject of inquiry is one of such common knowledge that the jury is " ' "just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates." ' "  (*Id.* at p. 762.)

Defendant was charged in count two with a violation of Penal Code section 149, which criminalizes a public officer who, under color of authority, assaults or beats any

---

[6]    Alternatively, if we find the issue is not cognizable on appeal because defense counsel failed to renew his objection at trial, defendant asserts he received ineffective assistance of counsel.  Because we address his claim on the merits, it is unnecessary to consider the ineffective assistance claim.

person "without lawful necessity", i.e., with more force than was reasonably necessary under the circumstances. (*People v. Perry* (2019) 36 Cal.App.5th 444, 467.) In other words, Penal Code section 149 punishes a use of force that exceeds what is reasonably required for the accomplishment of a recognized, lawful purpose. (*Perry, supra*, at p. 467.) This is "effectively shorthand for the standard applied in cases alleging excessive force in violation of the Fourth Amendment." (*Ibid*.)

Under the Fourth Amendment, a claim that law enforcement officers used excessive force is analyzed under an objective reasonableness standard. (*Murchison v. County of Tehama* (2021) 69 Cal.App.5th 867, 887.) But " '[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather with the 20/20 vision of hindsight.' " (*Ibid*.; see Pen. Code, § 835a, subds. (a)(4), (b).) " ' "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." ' [Citation.]" (*Murchison, supra*, at p. 887.)

In the instant case, there was a mutual request by both parties to present expert testimony on police use of force. The trial court granted that request, noting that there would be no "imbalance" since the jury would hear experts from both sides.

Defendant, however, filed a motion in limine to exclude evidence regarding the Elk Grove Police Department's use-of-force policy and procedures and whether defendant complied with them. Defendant argued that such evidence should be excluded because it was irrelevant, improper character evidence, and unduly prejudicial. The prosecution filed a written opposition.

The trial court denied the motion, ruling that the prosecution could introduce the evidence subject to a limiting instruction. The court also prohibited the parties' experts from expressing an opinion on the ultimate issue of fact whether defendant used excessive force in this case.

At trial, after evidence relating to the Elk Grove Police Department's use-of-force policy and procedures was introduced, the trial court admonished the jury: "We just received testimony to the extent that the witness testified that basically a violation of policy is a violation of the law. That is an incorrect statement. That is an incorrect legal principle, and I'm striking it from the record, and I'm admonishing each of you to disregard it. You're not [to] use that as a standard. You'll be instructed on the legal standards that exist in this case, at the conclusion of the case."

The trial court then gave the following limiting instruction: "Ladies and gentlemen of the jury, you've just heard testimony regarding the policies and procedures of the Elk Grove Police Department regarding the use of force by an officer during the performance of his or her official duties. An officer's violation of a police department's policies on the use of force during the performance of his or her official duties cannot, by itself, establish that an officer['s] actions amount to excessive force. It is but one of a number of factors for consideration on the issue of whether the force used was excessive."

B.    *Analysis*

We begin our analysis by emphasizing what is *not* in dispute: that expert testimony on the use of force is generally admissible in excessive force cases. This conclusion flows from our opinion in *Allgoewer, supra*, 207 Cal.App.4th 755, which dealt with the admission of expert testimony in a civil excessive force case.

In *Allgoewer*, the plaintiff sued a city and two of its police officers for damages based on an excessive use of force during his arrest. (*Allgoewer, supra*, 207 Cal.App.4th at p. 757.) The trial court granted a nonsuit motion on the ground the plaintiff had not presented any expert testimony to show what force a reasonable officer would have used under the same or similar circumstances. (*Id*. at pp. 757, 760.) The question on appeal was whether the trial court erred in concluding that expert testimony is *required* to establish that a particular use of force is objectively unreasonable. (*Id*. at p. 757.)

20

Reversing the trial court, we concluded that while expert testimony may be admissible in an excessive force case, there is no per se *requirement* that a plaintiff present expert testimony to prove an excessive force claim. (*Id*. at pp. 763-764.) We explained that determining whether a particular use of force was excessive is not "so far removed from the comprehension of a lay jury as to necessitate expert opinion testimony . . . ." (*Id*. at p. 765.)

Nevertheless, our opinion in *Allgoewer* made clear that *necessity* is not the measure for *admissibility*. (*Allgoewer, supra*, 207 Cal.App.4th at pp. 763-764.) Even if a matter is within a jury's comprehension, expert testimony may be admitted if it would "assist" the jury. (*Id*. at pp. 761, 763; see *People v. McAlpin, supra*, 53 Cal.3d at pp. 1299-1300.) Just as the facts of each case will dictate whether a use of force was reasonable, so too the facts " 'will determine whether expert testimony would assist the jury.' " (*Allgoewer, supra*, at p. 763.) Thus, where the force used is " 'reduced to its most primitive form—the bare hands—expert testimony might not be helpful.' " (*Ibid.*) But where the reasonableness of the officer's conduct implicates specialized police training or experience, or the subtleties of police procedure and practice, expert testimony may assist the jury to understand the evidence and determine the facts in issue. (*Id*. at pp. 763, 765; accord, *People v. Sibrian* (2016) 3 Cal.App.5th 127, 135-136 (*Sibrian*); *People v. Reardon* (2018) 26 Cal.App.5th 727, 738 (*Reardon*); see *Kopf v. Skyrm* (4th Cir. 1993) 993 F.2d 374, 378-379.)[7]

With this framework in mind, we turn to the question presented here: whether the trial court erred in allowing the prosecution's expert to testify on the Elk Grove Police Department's use-of-force policy and procedures and whether defendant violated them.

---

[7] To the extent *People v. Brown* (2016) 245 Cal.App.4th 140—a case on which defendant relies—suggests expert testimony regarding police use of force should be admissible *only* in cases involving specialized weapons or tools (e.g., guns, dogs, pepper spray) (*id*. at pp. 165-166), we decline to follow it.

We review the trial court's decision to admit the evidence under the abuse of discretion standard (*People v. Dworak* (2021) 11 Cal.5th 881, 895), and find no abuse of discretion.

Although it was the jury's role to determine whether defendant's use of force was reasonable, it bears repeating that the test of reasonableness is judged from the perspective of a reasonable *officer* in the defendant's position. (*Allgoewer, supra*, 207 Cal.App.4th at p. 762; *Graham v. Connor* (1989) 490 U.S. 386, 397 [104 L.Ed.2d 443, 456].) Unlike private citizens, police officers are trained in specialized techniques and standards that the jury may not fully understand without expert assistance, such as threat assessment, principles of proportionate/escalating force, how and when to deploy lethal force, and tactics to overcome a noncompliant suspect. When such matters are at issue in a use-of-force case, expert testimony on law enforcement policies and procedures can assist the jury by providing a framework for evaluating the defendant's conduct. (*Allgoewer, supra*, at p. 765; *Sibrian, supra*, 3 Cal.App.5th at pp. 135-136; *Reardon, supra*, 26 Cal.App.5th at pp. 739-740; see *United States v. Brown* (11th Cir. 2019) 934 F.3d 1278, 1296.) Such was the case here.

This was not a simple physical use of force against a handcuffed or restrained detainee. As the trial court found, the situation was complicated by the suspect's attitude and "noncompliance specific to the issue of placing his hands in and around his waist as he was prone[] . . . on the ground, . . . the potential threat that may have arisen [from] that," and determining a proper application of force in response to those facts. Even if this was not a case in which the handling of some specialized law enforcement tool (e.g., a police dog) had to be explained, we agree with the trial court that it was a case where knowledge of the department's policy and procedures could help the jury to better understand the evidence and determine the reasonableness of defendant's conduct under the circumstances confronting him.

We draw support for our conclusion from *Sibrian*, in which the First Appellate District, Division One, upheld the introduction of testimony from a prosecution expert on

police training and tactics relating to the use of force in a trial for resisting an officer. (*Sibrian, supra*, 3 Cal.App.5th at pp. 129, 133-139.) The trial court allowed the expert testimony because it "cover[ed] matters beyond the common experience of an ordinary juror," such as " 'issues of incremental use of violence and the kind of force that can be used' " in response to a noncompliant suspect, as well as the "the potential continued danger posed by a suspect after he has been wrestled to the ground." (*Id*. at pp. 133-134.) This case is similar.

We find additional support for our conclusion in *Reardon, supra*, 26 Cal.App.5th 727, which involved a trial for resisting an officer who repeatedly struck the defendant with a baton while he was on the ground. (*Reardon*, *supra*, at pp. 730-731.) In that case, we held the trial court was wrong to exclude expert testimony by which defendant sought to show officers "could have restrained him through lesser means known to them based on their training and the facts as they reasonably perceived them . . . ." (*Id*. at p. 739.) We indicated that was precisely the kind of testimony that *Allgoewer* indicated could be useful to a jury's understanding of the case. (*Id*. at p. 740; see also *Smith v. City of Hemet* (9th Cir. 2005) 394 F.3d 689, 703, disapproved on other grounds in *Lemos v. County of Sonoma* (9th Cir. 2022) 40 F.4th 1002, 1009.) The same is true here.

Additionally, because the defense had its own use-of-force expert, the trial court knew the defense would have the opportunity to respond to any points made by the prosecution's experts. Accordingly, we conclude the trial court did not abuse its discretion in finding the challenged evidence would assist the jury.[8]

Even if the evidence was admissible under Evidence Code section 801, defendant argues it should have been excluded under Evidence Code section 352 because its

---

[8] The evidence of police guidelines and training also was admissible to assist the jury in determining whether defendant acted in self-defense. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; CALCRIM No. 3470.)

probative value was "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Defendant contends the evidence should have been excluded because it was confusing and effectively invited the jury to use the officer's compliance (or noncompliance) with local training as a proxy for reasonableness. We are not persuaded.

The trial court acknowledged the risk that the jury might conflate the question of whether defendant used excessive force with the question of whether he followed his police training. To address this concern, the court admonished the jury that a violation of police department use-of-force policies cannot, by itself, establish excessive force, and that it is but one of a number of factors for consideration on the issue of whether the force used was excessive. (See *United States v. Brown, supra*, 934 F.3d at p. 1296.) We presume jurors follow the instructions they are given. (*People v. Carey* (2007) 41 Cal.4th 109, 130.) As a result, the court's instruction effectively eliminated the danger that the jury would confuse or conflate the issues. (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 247 [a limiting instruction can ameliorate prejudice by eliminating the danger the jury could consider the evidence for an improper purpose]; *People v. Lindberg* (2008) 45 Cal.4th 1, 25-26.) On this record, the trial court did not abuse its discretion in admitting the evidence.

For similar reasons, we also reject defendant's constitutional arguments. This was not a case where defendant was denied due process or a fair trial.

## DISPOSITION

The judgment is affirmed.

　　　　　　　　　　　　　　　　　　　/s/　　　　　　　　　　,
　　　　　　　　　　　　　　　　　　　Krause, J.

We concur:

　　　\s\　　　　　　　　　　,
Robie, Acting P. J.

　　　\s\　　　　　　　　　　,
Boulware Eurie, J.